No.   13-1775
_____

In the
UNITED STATES DISTRICT COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

STACEY STEWART,

Plaintiff-Appellant,
v.
MTR GAMING GROUP, INC.
d/b/a MOUNTAINEER CASINO
RACETRACK AND RESORT,

Defendant-Appellee.
_____

On Appeal from the United States District Court
For the Northern District of West Virginia
(The Honorable John Preston Bailey, Chief Judge)
_____

OPENING BRIEF OF APPELLANT
STACEY STEWART
_____

Daniel W. Cooper, Esquire          Jacob Robinson, Esquire
COOPER & LEPORE                    ROBINSON LAW OFFICES
302 Third Street                   Robinson Professional Center
Carnegie, PA 15106                 1140 Main Street, Third Floor
Tel: 412-278-0912                  Wheeling,WV 26003-2704
Fax: 412-505-6800                  Tel: 304-233-5200
cooperandlepore@hotmail.com        Fax: 304-233-2089
                                   rlegal@swave.net


July 29, 2013          *Attorneys for Plaintiff-Appellant Stacey Stewart*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND INTERESTS

Pursuant to Rule 26.1, Fed. R. App.P., Appellant Stacey Stewart states as follows:

No publicly held corporation has a direct financial interest in the outcome of the litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement.   There are no similarly situated master limited partnerships, real estate investment trusts, or other legal entities whose shares are publicly held or traded.   No trade association is a party to the litigation.

*/s/ Daniel W. Cooper*
**Daniel W. Cooper, Esquire**
**Attorney for Stacey Stewart**

**Dated: July 29, 2013**

i

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND INTERESTS........................  i

JURISDICTIONAL STATEMENT.....................................................................  1

ISSUES PRESENTED....................................................................................  1

STATEMENT OF THE CASE...........................................................................  2

STATEMENT OF FACTS.................................................................................  2

      A.  Initial Employment.................................................................  2

      B.  Initial Complaints to Immediate Supervisor...................................  3

      C.  Meetings with Human Resources................................................  3

      D.  Discipline to Stewart and Termination........................................  5

SUMMARY OF ARGUMENT.........................................................................  11

ARGUMENT..............................................................................................  13

I.  The Applicable Legal Standard....................................................................  13

    A.  Appellate Standard of Review.....................................................  13

    B.  Standard for Summary Judgment.................................................  13

II.  The Claims Advanced by Stacey Stewart.......................................................  14

    A.  Sexually Hostile Work Environment...............................................  14

        1.  Applicable case law on hostile work environment...................  16

    B.  Retaliation and pretext/mixed motive............................................  18
      1.  Applicable case law.......................................................  18

CONCLUSION...........................................................................................  25

CERTIFICATE FOR COMPLIANCE WITH RULE 32(a)...........................................  26

CERTIFICATE OF SERVICE...........................................................................  27

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE(S)**

ANDERSON v. LIBERTY LOBBY, 477 U.S. 242.................................................. 11,13

CLARK COUNTY SCHOOL DISTRICT v. BREEDEN,
       532 U.S. 268 (2001)...................................................................... 24

DIAMOND v. COLONIAL LIFE, 416 F.3d. 310 (4TH CIR. 2005)......................... 20

EEOC v. NAVY FED. CREDIT UNION,
       424 F. 3d. 397 (4TH CIR. 2005)....................................................... 13

HOLLAND v. WASHINGTON HOMES, INC.,
       487 F.3d. 208 (4TH CIR. 2007)........................................................ 1, 13

McDONALD DOUGLASS v. GREEN, 411 U.S. 792 (1973)................................ 20

MERRITT v. OLD DOMINION FREIGHT LINE, INC.,
       601 F. 3d. 289 (4TH CIR. 2010)....................................................... 13

MOSBY-GRANT v. CITY OF HAGERSTOWN,
       630 F. 3d. 326 (4TH CIR. 2010)....................................................... 18

OKOLI v. CITY OF BALTIMORE,
       648 F. 3d. 216 (4TH CIR. 2011)....................................................... 16, 17, 18, 20

PRICE v. THOMPSON, 380 F. 3d. 209 (4TH CIR. 2004)....................................... 24

REEVES v. SANDERSON PLUMBING PRODS., 530 U.S. 133 (2000)............... 1, 11, 19

ST. MARY'S HONOR CENTER v. HICKS, 509 U.S. 502 (1993)........................ 19

TINSLEY v. FIRST UNION NAT. BANK, 155 F.3d 435 (4th CIR. 1998) ........... 19

WHITTEN v. FRED'S, INC., 601 F. 3d. 231 (4TH CIR. 2010).............................. 18

**STATUTES:**

       28 U.S.C. § 1291 (2006)............................................................... 1
       42 U.S.C. § 2000e-5(f)(3)(2006).................................................. 1

**RULES:**

       FRAP 4(a)(1)B................................................................................ 1

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 42 U.S.C. §2000e-5(f)(3)(2006).   It entered a final judgment on May 20, 2013 to which Plaintiff-Appellant Stacey Stewart ("Stewart") timely filed a notice of appeal on June 17, 2013 (JA-66); FRCP 4(a)(1)(B) and this Court has appellate jurisdiction under 28 U.S.C. §1291 (2006).

# ISSUES PRESENTED

1.     Did the district court err by disregarding Reeves v. Sanderson Plumbing Prods., 530 U.S. 133 (2000), and requiring Stewart to offer evidence beyond that necessary to make out a *prima facie* case of retaliation to support a finding that MTR's explanation for its actions was pretextual (pretext-plus)?

2.     Did the district court err in rejecting all of Stewart's evidence of pretext by weighing the evidence and drawing inferences to favor MTR in contravention of the summary judgment standard applicable in this matter and the requirement to view the evidence in light most favorable to Stewart?   Holland v. Washington Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007)?

3.     Did the district court err in failing to find that Stewart had set forth a *prima facie* case of a sexually hostile work environment?

1

## STATEMENT OF THE CASE

Stewart appeals from the district court's order and judgment granting summary judgment on her claims of sex discrimination (sexually hostile work environment) and retaliation for her discharge on June 14, 2011.

Stewart filed a charge of discrimination and retaliation with the EEOC. Thereafter, Stewart filed suit in the state court of West Virginia. That suit was subsequently removed to the Federal District Court for the Northern District of West Virginia on May 4, 2012.

On April 5, 2013, MTR filed a motion for summary judgment which was granted on May 20, 2013. On June 17, 2013, Stewart timely filed this appeal.

## STATEMENT OF FACTS

### A.   Initial Employment

Stewart became employed as a table games dealer at MTR on March 18,2010. JA-87.  Table games dealers at casinos, such as MTR Mountaineer Casino, work in an area called a "pit" that contains several table games for customer use. JA-181-83. Shortly after she began her employment she became the recipient of abusive, disgusting and embarrassing sexual comments from male supervisors and employees in her pit. We will not set forth the details of the

2

specific offensive comments and other offensive conduct in this Brief.   Many are set forth in detail in the Appendix at JA-259 during meetings with MTR Human Resources Representatives and in Stewart's deposition at JA-191-203.   She stated she was "stressed" coming to work.   JA-202.

## B.   Initial Complaints to Immediate Supervisor

After enduring this disgusting and demeaning environment for several months, Stewart made her first complaints to her immediate supervisor on February 23, 2011.   JA-255-57.   Her immediate supervisor, Brandon Tipton, brought her to a higher level supervisor named Sloane where she again restated the sexually offensive conduct she had endured.   Stewart described her condition resulting from this sexually offensive conduct as stressful, humiliating, embarrassing, and degrading.   She said she was a "basket case" having lost 30 pounds.   JA-221.

Following her meeting with Sloane, she was removed from the pit in which she worked.   Her situation improved for a short time for the obvious reason that she was removed from the pit where the offenders worked.

## C.   Meetings with Human Resources

On April 18, 2011, she requested a meeting with representatives of the MTR Human Resources Department.   Meetings were held on April 18, 2011 and April

3

21, 2011.  The meeting on April 21, 2011 included a male dealer named Mark Demarco.  At those meetings, Stewart and Demarco related the sexually offensive conduct directed at Stewart with names of employees and supervisors.  JA-259-64.

On April 19, 2011, less than 24 hours after her meeting with HR that included HR Director, Vincent Azzarello.  Azzarello asserted to other managers that Stewart was "testing" MTR for retaliation. JA-265.  Without bothering to ascertain why Stewart had left early on April 18, 2011, claiming she was distraught,  a Corrective Action Notice was prepared for issuance to her. A266.  It was his assistant, Linda Mays, who  reported receiving a phone call from Stewart who reported that she learned that a lottery official, Nicole Floyd, was repeating a false rumor concerning her and Demarco and that was the reason she was distraught. JA-265.

Shortly before April 18, 2011, a false rumor had began circulating throughout the facility that Stewart and Demarco had been caught having sex on MTR property by security. JA-259. In fact, on April 29, 2011, Azzarello gave Stewart a letter confirming the rumor was in the workplace.  JA-268.  She described the situation as being throughout the workplace with both employees and supervisors spreading this false rumor.  JA211-14.  Azzarello responded to a question during his deposition regarding whether the rumor was widespread that

4

"they all seemed to be aware of it". JA-282   In fact, Stewart reported to Azzarello during the meeting on April 21, 2011, that a supervisor, Howard Beynon, asked her if she needed a "pimp".   JA-263; JA-282.

On May 2, 2011, Stewart reported that while in the lunch room, an employee had made fun of her with regard to the false rumor.   She reported that 2 supervisors were present and heard the comment.   They did nothing! JA-269. Stewart complained of supervisors putting their hands around her waist and touching the small of her back on April 29, 2011, May 19, 2011 and May 29, 2011. JA-136-47.   Stewart testified that no supervisor had put their arms around her waist before she complained of sexual harassment.   JA-215.   In fact, MTR's own sexual harassment policy contained in the Employee Handbook states that sexual harassment includes "unwelcome touching, patting or physical contact."   JA-327. Such conduct has been traditionally described as being an element in sexual harassment conduct.

### D.   Discipline to Stewart and Termination

Stewart had received no disciplinary action from the time she began her employment until late May of 2011.   In fact, she had received positive employment evaluations throughout her term of employment.   JA-158-63.   On May 28, 2011 she was issued two (2) corrective action notices.   JA-275.   One was

5

for a parking violation and one was for an alleged shortage that Stewart contested. In response to an interrogatory regarding each and every instance of discipline issued to Stewart, MTR responded that just two were issued. One being an alleged shortage, and the other a parking violation. Corrective action notices for both these matters were issued to Stewart on May 28, 2011. JA-273. With regard to the alleged shortage, Stewart contested this matter because it was not made known to her until the next day when normally such matters are resolved quickly. JA-244-47. Stewart wrote on the Corrective Action Form that if the event had occurred as alleged, the monies to the customer would have been approved by the floor supervisor. JA-275. The supervisor did not receive any discipline and the lottery commission person involved in the matter was Nicole Floyd, who had repeated the false rumor and whom Stewart had threatened to sue. JA-276. On the shortage report for the month of May 2011, only Stewart is listed as an amount. JA-277. A comment by Casino Management states a lack of corrective action notices on shortages. JA-278. On June 8, 2011, the West Virginia Lottery Commission issued a violation report. This report asserted that an off-duty dealer and an on-duty dealer had an animated conversation that allegedly diverted the attention of the on-duty dealer from the game. JA-152. The off-duty dealer was Stewart and the on-duty dealer was Mark Demarco. On June 14, 2011, Stewart

6

was called to the office of Vincent Azzarello and summarily discharged.    JA-254. This conversation between Stewart and Demarco was recorded on the MTR security camera system and is approximately 3 minutes in length and has been viewed as a part of this lawsuit.   JA-254.

According to Azzarello, any violation report first goes to an MTR individual named William Beaumont.    JA-292-93.    In his Affidavit at paragraph 9, Beaumont states that a licensee (MTR) is required to respond to a violation report in 10 days "and to take action where appropriate".   JA-150.   In response to an interrogatory as to whether or not the violation report required that Stewart be discharged, MTR responded that it did not.   JA-274.

In her Affidavit, Stewart recounts what is shown on the video.   JA-254. She states that no customer who was playing the game left the area, and that she engaged in pleasant conversation with some customers who were observing.   She states that although 2 supervisors were within the very immediate area of the conversation, they issued no admonishment to either Stewart or Demarco.   She states that no customer complained and that conversations between off-duty dealers and on-duty dealers happen often and there is no published rule by MTR to the contrary.   JA-254.

7

During his deposition, Azzarello gave the following responses regarding his viewing of the recorded conversation and his decision to terminate Stewart. JA295-326.   It is noted that the video recording has no audio.

From the outset, Azzarello admits that he made no determination as to which customers were actually playing the game and which customers were simply observing.  JA-295-96.  He acknowledges that customers leave the table all the time for various reasons.  JA-296.  He states that it was irrelevant to him as to which customers were players at the table and which customers were merely observing.  JA-297.  He references a gesture made by Demarco toward Stewart, but references no gesture by Stewart.  JA- 298.  There was no such gesture by Stewart.   Azzarello makes the statement that the guests were listening to the Stewart conversation even though the video has no audio.  JA-299.  He admits that Steward engaged one female customer in conversation and they were smiling and laughing.  JA-299-300.  Azzarello then references that only 2 customers left the area, rather than 4, and again states he did not care that the 2 customers actually seated and playing the game never left.   JA-300.

The citation from the Commission states that Demarco was not protecting the bankroll or the layout.  JA-301.  However, Demarco did not experience any shortage, the roulette wheel never stopped spinning as required, and Demarco made

the typical required "plays" during the period.  JA 301-02.    Azzarello admitted that he did not know the nature of the asserted violation and code cited in the violation report or why the code was in fact cited. JA-302. In addition, although the recording shows Demarco having to turn completely away from the players, the bankroll and the table face itself to use the "mucking machine" associated with the game, Azzarello admitted to having no knowledge of the use and purpose of the mucking machine during game play.   JA302-04.

Azzarello acknowledges seeing a security person walk by the aisle near the table during the conversation and who gave no admonishment to Stewart or Demarco.   JA- 305.   Azzarello further acknowledges that the video shows 2 supervisors present in the immediate area of the conversation, but disputes the length of time they were present.   JA-305.   Azzarello admits that he made no observations as to who the supervisors were, that neither supervisor made any comments to Stewart or Demarco during the tape, and he did not ask either supervisor any questions regarding the conversation during his "investigation". JA307-12.   Neither supervisor received any discipline for their non-action during the Stewart/Demarco conversation.   JA-315.

In response to the citation, William Beaumont sent a letter to the Lottery Commission stating that the employees were terminated "as a result of this event and coupled with previously issued progressive disciplinary action". JA 153. Azzarello stated that he told Beaumont that Stewart had been the subject of progressive disciplinary action. JA314; 322-23). Azzarello attempted to "insert" an additional disciplinary event for Stewart involving an alleged incident at "Big Al's Deli" that is onsite. JA314-15. He admits that Stewart did not receive any disciplinary notice and she is not mentioned at all in the security incident report and that the nature of his phone call to her was to see if she was alright. JA315-18.

With regard to the citation itself, Azzarello admitted to having no knowledge as to the basis, by the code cited in the violation, for the citation that was issued. JA 318-27. Azzarello acknowledges that MTR received no fine or other sanction for the alleged violation. JA-322. Azzarello again acknowledges that the progressive disciplinary action referred to in the Beaumont response to the Lottery Commission does refer to Stewart JA322-23.

Finally, as stated in her Affidavit, Stewart had threatened to bring suit against the Lottery Commission for the action of Nicole Floyd, their employee, and against MTR, for the unlawful actions directed against her. JA-256-57.

10

Furthermore, although Stewart and Demarco named several individuals and supervisors who made offensive comments, no person named or interviewed by MTR received any termination notice or corrective action form.   JA-284-86.

## SUMMARY OF ARGUMENT

Stacey Stewart, a female, who served the employer through months of being the recipient of foul and disgusting sexual comments, is entitled to have her claims heard by a jury.   When she finally complained of this offensive conduct she, in fact, became the target of MTR's supervisory staff and MTR's Human Resources Department.   The district court erred in several ways when it denied Stacey Stewart the opportunity to present her claims to a jury.

First, the district court held Stewart to a "pretext plus" standard by repeatedly requiring her to present more than proof, of a *prima facie* case from which a reasonable jury could find pretext and in fact rejecting every advanced assertion of pretext evidence.   This is contrary to Reeves v. Sanderson Plumbing Prods., 530 U.S. 133 (2000).

Second, the district court misapplied the summary judgment standard when it analyzed the evidentiary record.   A court may grant summary judgment only if the "evidence is such that it would require a directed verdict for the moving party". Anderson v. Liberty Lobby, 477 U.S. 242, 251-52 (1986).   Here the district court

11

decided genuine issues of fact, weighed the evidence, and drew inferences in favor of MTR thereby rejecting each and every element of pretext evidence advanced by Stewart. In addition, the district court completely credited the explanations and justifications offered by MTR even though the evidence casts substantial doubt on offerings made by MTR. In this case temporal proximity is such that it satisfies the causation requirement. The testimony of Vincent Azzarello, the MTR official who fired Stewart literally borders on being inherently incredible.

Third, the district court erred in failing to find that Stewart had presented a *prima facie* case of sexually hostile work environment.  Such a claim is independent from a retaliation claim.

There is simply no doubt that Stewart presented a *prima facie* case of a hostile work environment.  She also presented a case of retaliation by proving that she engaged in protected activity, there was adverse action and she offered substantial evidence from which a reasonable jury could find pretext/mixed motive. This is all that is necessary to defeat summary judgment.

Lastly, Stewart advises that no appeal issue is raised or made regarding alleged violations of West Virginia Law. In addition, contrary to what the district court states regarding a claim by Stewart of a discriminatory act by MTR for her removal from her initial pit (JA-52-3) no such claim was made below or nor is the

12

same being made on appeal. The adverse employment action is and has been Stewart's termination on June 14, 2011.

## ARGUMENT

### I. The Applicable Legal Standard

### A. Appellant Standard of Review

This Court reviews the district court's grant of summary judgment *de novo*, construing facts and drawing inferences in favor of the non-moving party. See EEOC v. Navy Fed. Credit Union, 424 F.3d. 397,405 (4th Cir. 2005).

### B. Standards for Summary Judgment

In Anderson the Supreme Court stated that "at the summary judgment stage the judges's function is not to himself to weigh the evidence and determine the truth of the matter but to decide whether there is genuine issue of fact for trial". Anderson, 477 US at 249. This Court has stated that summary judgment is only appropriate when "there is no genuine issue as to any material fact". Merritt v. Old Dominion Freight Line, Inc. 601 F.3d. 289, 295 (4th Cir. 2010). District courts "must construe the facts in the light most favorable to the non-moving party and may not make credibility determinations or weigh the evidence". Holland v. Washington Homes, Inc. 487 F.3d. 208,213 (4th Cir. 2007).

13

## II. The Claims Advanced by Stacey Stewart

## A. Sexually Hostile Work Environment

Table game dealers at MTR work in an area referred to as a "pit". It is submitted that Stacey Stewart worked in a cesspool staffed by foul mouthed male supervisors and employees who repeatedly made foul and disgusting sexual comments as well as physical touching directed to Stewart. Without repeating them here, the nature of the offensive conduct is in the Appendix at JA-259-64 and in her deposition at JA-190-201. No other characterizations of these comments exist other than foul, disgusting, demeaning, degrading and embarrassing! JA-221;253-54. Moreover, after making her complaints of sexual harassment (but never before) supervisors began putting their hands and arms around her waist and in the small of her back. JA-136-47; JA-215. How did the district court view this evidence? Was this evidence viewed in a light most favorable to Stewart? The answer is no!

With regard to these terrible comments and actions directed toward Stewart the district court first states that "the plaintiff has presented a genuine issue of material fact regarding the duration, pervasiveness and seriousness of the alleged inappropriate comments." JA-43. The district court then goes on to weigh the evidence and essentially make a credibility finding by stating that Stewart produced no corroborating evidence regarding the comments. JA-43. No corroborating

14

evidence is required! On this point, apparently the district court forgot that Mark Demarco was present at the with Human Resources on April 21, 2011 and confirmed the offensive conduct and touching. JA-261-65. If in fact the district court remembered without saying, then we must assume that the district court made an another credibility finding as to Demarco. This is all simply wrong and contrary to the summary judgment standard.

It should ne noted here that it is not the existence of the false rumor itself that is a part of the hostile work environment claim. Stewart does not contend that there is evidence that MTR as an entity started the rumor. Rather, Stewart's position regarding the rumor is that when it is circulated by supervisors coupled with derogatory comments by supervisors and repeated by employees in the presence of supervisors who do nothing, such actions and inactions by supervisors are imputed to the employer as conduct that is in furtherance of a sexually hostile work environment. JA-233-54;263;269;282. The district court made absolutely no reference to the actions and inactions of supervisors in regard to the rumor, but instead focused on the rumor itself and whether or not it was related to Stewart as a female. The district court ignored that a supervisor asked her if she need a pimp; a "service" typically associated with females. According to the district court, telling the supervisors to behave was sufficient.

15

In reviewing the 3 complaints that Stewart made regarding unwanted touching by superior in May 2011, the district court simply embraced the position of MTR that the touchings "were not sexual in nature." JA-44. In substance the district court completely "resolves" this issue in favor of MTR and sees it as an isolated issue and not a continuation of the ongoing sexual harassment being heaped upon Stewart. MTR's own Employee Handbook states that "Sexual harassment includes.... unwelcome touchings, patting or physical contact". JA-327.

These actions by the district court present clear instances of deciding issues of material fact, weighing the evidence and drawing inferences in a light most favorable to MTR. This contravenes the applicable summary judgment standards.

### 1. Applicable case law on hostile work environment

At this juncture Stewart points to the recent decision of this Court in Okoli v. City of Baltimore, 648 F.3d. 216 (4th Cir. 2011). Like the instant case the plaintiff in Okoli had brought claims of sexual harassment and retaliation only to have them dismissed on summary judgment by the district court. Id. at 217-19. This Court vacated the summary judgment and remanded the case. Id. at 225. Stewart submits that this Court's reasoning, analysis and application of the law should parallel what should be the outcome in the instant case.

16

The Court set forth (at 220)  the elements necessary for a *prima facie* case

of a hostile work environment. They are:

1.  Unwelcome conduct;
2.  that is based on the plaintiff's sex;
3.  which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and
4.  which is imputable to the employer.

As noted above, the district court actually made a correct finding by stating that

Stewart had presented a "genuine issue of material fact regarding the duration,

pervasiveness and seriousness of the alleged inappropriate comments." JA-43. This

finding would certainly satisfy the first 3 elements of a *prima facie* case that this

Court set forth in Okoli. After reviewing the instances of alleged objectionable

conduct in Okoli at 220-21 this Court made no mention whatsoever regarding the

need for corroborating evidence. In regard to element 4 above, Stewart provided

instances when supervisors made offensive comments in the "pit", asked her if she

needed a "pimp", their failure to stop or reprimand an employee on May 2, 2011

from making fun of Stewart regarding the "rumor" and unwanted physical

touchings on 3 instances by supervisors thru May 29, 2011 are all imputable to the

employer. Stewart related to the employer that she felt "ostracized". JA-272. That

was  probably  an  understatement  after  she  had  turned  in  essentially  the  entire

17

employee and supervisory staff of pit 1and threatened to sue the West Virginia Lottery Commission and MTR. Stewart stated in her deposition that the humiliation and embarrassment "went on the whole time, but it got considerably worse when HR got involved". JA-222.

This claim of a sexually hostile work environment must be submitted to a jury. Stewart presents a very strong claim when "objectively viewing the severity of harassment...from the perspective of a reasonable person in plaintiff's position". <u>Okoli</u> at 222. See also <u>Whitten v. Fred's Inc.</u>, 601 F.3d. 231,243 (4th Cir. 2010); <u>Mosby-Grant v. City of Hagerstown</u>, 630 F.3d. 326, 336 (4th Cir. 2010).

## B.    Retaliation and pretext/mixed motive

### 1. Applicable case law

Stewart was summarily discharged on June 14, 2011. A claim of retaliation is made as a result of Stewart engaging in protected activity. Turning again to this Court's decision in <u>Okoli</u>, 648 F.3d. 216 (4th Cir. 2011), the Court sets forth at 223 the elements of a retaliation claim.

1.   the plaintiff engaged in a protected activity...;
2.   the employer acted adversely against plaintiff; and
3.   the protected activity was causally connected to the employer's adverse action.    (citations omitted)

18

In the instant case elements 1 and 2 do not require review since the facts clearly establish those elements of the claim. This leaves us with element 3; causal connection.

This Court has stated that "very little evidence of a causal connection is required to establish a *prima facie* case. <u>Tinsley v. First Union Nat. Bank</u>, 155 F.3d. 435, 443 (4th Cir. 1998). The applicable review standard is found in <u>Reeves v. Sanderson Plumbing Prod. Inc.</u>, 530 US 133 (2000) and not <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993) that is cited by the district court. In fact, the district court makes no reference to <u>Reeves</u>. Once a plaintiff asserting retaliation puts forth evidence of pretext/causal connection there is no need to provide additional evidence that discrimination was the true reason for the employer's adverse action. <u>Reeves</u> at 147-48. This is a rejection of the pretext-plus standard.

The district court, after erroneously rejecting all evidence of causal connection, appears to state at JA-51 that Stewart cannot show that sex discrimination, in addition to pretext, motivated MTR to fire her. The district court repeatedly states that even if it found "base discrimination" something more than the pretext offerings is needed to establish causal connection. JA-42;43;46;51. This approach is rejected by <u>Reeves</u>.

In this case the district court erroneously rejects all evidence advanced by Stewart to show pretext or causal connection. It is noted here that in Okoli at 225 this Court stated that in regard to the defendant's offering of a legitimate basis for firing the plaintiff that "returns to the question of mixed motives and pretext". Emphasis added. In Diamond v. Colonial Life, 416 F.3d. 310, 318 (4th Cir. 2005), this court stated that a plaintiff may avert summary judgment by utilizing either the "mixed motive" standard or the "pretext framework" of McDonnell Douglas v.Green, 411 U.S. 792 (1973). Under the "mixed motive" standard all that is necessary is to offer evidence that an impermissible factor was a motivating factor in the employer's adverse action. It need not be the sole factor. Quite frankly, Stewart has advanced very substantial evidence to satisfy either standard. In this case the district court goes about rejecting Stewart's evidence by weighing the evidence and drawing inferences in favor of MTR rather than Stewart.   For example, Stewart advances that during the 3 minute conversation that led to her discharge, supervisors are in the immediate area and make to comment to her regarding any "customer service issue".   To this fact, the district court states that it has no bearing on the review by the Human Resources Department from which obviously no representative was present during the conversation, nor heard any portion of the conversation by recording.   JA50.   In addition, Stewart has asserted

20

that there was no "customer service issue" since no customer who was actually playing the game left the table area. Moreover, there was no customer service complaint made by any customer to anyone. To these facts, the district court proceeds to annunciate a principle of unknown origin by starting at JA50:

> However, a manager can identify a customer service issue even where a customer does not report an official complaint, regardless of whether or not that customer was merely on the premises or actively engaging in the services provided by the business.

This asserted special knowledge of a manager developed by the district court is certainly bizarre. This bizarre statement is clear example of the district court weighing the evidence and structuring a rather bizarre concept in order to view the evidence in a light most favorable to MTR. Furthermore, in reading the district court's opinion, it repeatedly relies on the assertion that the employer never stated that there was any other reason beyond the lottery citation for firing Stewart. JA-51-55. In other words, because the employer did not say "by the way, we are also firing you for protected activity" then whatever reason the employer has given suffices for the district court. Simply stated, even though Azzarello stated in his deposition that he is the person who told Beaumont that the "progressive discipline" reference in Beaumont's letter to the Lottery Commission relies to

21

Stewart, the district court concluded "the reference to progressive disciplinary action does not necessarily refer to the plaintiff." JA-50. These are all classic examples of weighing and construing evidence, and drawing inferences and conclusions in the light that most favors MTR, not Stewart.

In this case, Stewart was fired by Vincent Azzarello, Director of Human Resources of MTR. Azzarello first met Stewart on April 18, 2011 during her initial complaint meeting with HR. From that point forward, Stewart became the "target". Less than 24 hours after that initial meeting, Azzarello learned that Stewart had left work early from her evening shift because she was distraught. His very first reaction was not to see to the well-being of Stewart who had just related very serious instances of sexual harassment. Instead, his very first reaction was to send an email (JA-265) stating:

> "She is testing us to see if we will retaliate against her."
> (Emphasis added).

An MTR Corrective Action Notice (JA266) was ready to issue. It was only after Azzarello's assistant, Linda Mays, learned from a phone call from Stewart that she was distraught that evening because a West Virginia Lottery official has been circulating the false rumor regarding her engaging in sexual activity on the premises. (JA267). Obviously, the Corrective Action Notice had to be pulled

back.  Well, Azzarello wasn't going to miss an opportunity, as he saw it, to rid MTR of someone who is making repeated complaints of sexual harassment and who has threatened to sue MTR.  All he had to do was blurt out the nebulous "customer service issue" and he was safe to hide behind the absurd lottery citation.

The absurdity of Azzarello's firing of Stewart is readily apparent from his repeated assertions that it made no difference to him whether customers were playing the game or just observing.  Any rationale analysis of which customers would be irritated or aggravated by Stewart's conversation leads directly to those customers who were actually playing the game and trying to win money. Azzarello could not include them in his so-called customer service issue because they never stopped playing or gave any indication whatsoever that they were irritated.  If he "includes" the players and their non-reaction, his "customer service issue" evaporates, because it is totally contrived.  He reaches the 2 observers who walked away through some ridiculous clairvoyance or special sense that they walked away because of Stewart, notwithstanding his admission that he observed Stewart having a pleasant conversation with a non-playing customer with both smiling and laughing.  The supervisors who were standing just a few feet from Demarco and Stewart gave no admonition because there was simply no reason to do so.  Stewart stated in her Affidavit, off-duty dealers go onto the floor and speak

23

with on-duty dealers without any issues from management.   JA-53.   Azzarello did not even know the basis for the code cited by the Lottery Commission observer for the citation.   His entire testimony as to why he fired Stewart is simply inherently incredible.   It certainly creates, without any doubt, a basis to reject summary judgment.

Stewart had been complaining from February 23, 2011 into the end of May 2011.   Stewart was fired on June 14, 2011.   This Court has stated that temporal proximity alone will suffice to establish a causal connection.   Clark County School District v. Breeden, 532 U.S. 268, 273 (2001); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004).   Stacey Stewart is clearly entitled to have her claims heard by a jury!

## <u>CONCLUSION</u>

For all the foregoing reasons, Stacey Stewart (Plaintiff-Appellant) respectfully requests that the Court vacate and reverse the district court's order granting summary judgment.


**Respectfully submitted,**


**By:**    *_/s/ Daniel W. Cooper_*               *_/s/ Jacob M. Robinson_*
            **Daniel W. Cooper, Esquire**          **Jacob M. Robinsion, Esquire**
            **COOPER & LEPORE**                   **ROBINSON LAW OFFICES**
            **302 Third Street**                        **1140 Main Street, Third Floor**
            **Carnegie, PA 15106**                    **Wheeling,W VA 26003-2704**
            **PA ID 10677**                              **W VA ID 3133**
            **Tel: 412-278-0912**                     **Tel: 304-233-5200**
            **Fax: 412-505-2800**                    **Fax: 304-233-2089**
            **cooperandlepore@hotmail.com**          **rlegal@swave.net**

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____        Caption: _____

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ ]    this brief has been prepared in a proportionally spaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*]; **or**

   [ ]    this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

# CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____
Signature

_____
Date